Booth, Chief Justice,
delivered the opinion:
This is a patent case. The suit is for the recovery o,f just compensation alleged to be due the plaintiffs because of the infringement by the defendant of Letters Patent #1329038, granted January 27, 1920. The acts involved are the act of June 25, 1910 (36 Stat. 851), as amended by the act of July 1, 1918 (40 Stat. 705), and the act of October 6, 1917 (40 Stat. 394). We refer to the above acts in detail hereafter..
The defendant contests the right of the plaintiffs to sue, alleging that the facts disclose that on the date the suit was instituted the plaintiffs were no,t the owners of the patent or the patent monopoly. The defense interposed is predi *306 cated upon section 4898, Revised Statutes, which reads as follows:
“ Sec. 4898. Every patent or any interest therein shall be assignable in law, by an instrument in writing; and the patentee or his assigns or legal representatives may, in like manner, grant and convey an exclusive right under his patent to the whole or any specified part of the United States. An assignment, grant, or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent Office within three months from the date thereof.”
and the following undisputed facts.
Glenn H. Curtiss on December 11, 1914, filed his application, serial number 876716, for the patent in suit. On December 24, 1915, Curtiss assigned the exclusive rights to the invention, as set forth in his application, to the Curtiss Motor Company, a New York corporation. On October 9, 1916, the Curtiss Motor Company assigned all its right, title, and interest in the invention to the Curtiss Aeroplane and Motor Corporation, a New York corporation, and from that date to the date of issue of letters patent to it on January 27, 1920, the latter corporation was the applicant for letters patent for the invention set forth in the Curtiss application. On August 19, 1920, and on August 20, 1920, the Curtiss Aeroplane & Motor Corporation executed two separate mortgages to the United States to secure the payment of $1,568,800 then due and unpaid. Each of these instruments covered all the property of the corporation, including the United States letters patent to Curtiss #1329038, and it was recited in the mortgages that “the corporation granted, bargained, sold, assigned, transferred, and conveyed to the United States ” all the property mentioned therein. In addition to the foregoing provisions of the habendvim clause of the mortgages the instruments recited that “ The Government shall suffer the corporation to possess, control, and manage all the property aforesaid, and to receive and use the income, revenue, and profits of any such property in the same manner and with the same effect as if this mortgage had not been made, so long as the corporation shall discharge the indebtedness secured by this mortgage and shall observe and perform all and singular *307 the covenants and agreements by it to be observed or performed in this mortgage contained.” The United States did not file the mortgages in the Patent Office, and on July 28, 1926, both mortgages were released by the United States as satisfied.
The petition in this case was filed November 5, 1924, at a time when the mortgages were in force, and of course some two years prior to their release. The plaintiffs seek no compensation for alleged infringing devices subsequent to June 30, 1923, and while some differences appear as to the extent of infringement prior to August, 1920, we think it unnecessary to attempt to reconcile them in view of opinion of the effect of the mortgages upon ownership of the patent."
The cases establish the rule that under the patent laws the giving of a mortgage by the patentee, “ unless otherwise provided in the mortgage,” effects an assignment of the patent to the mortgagee. To the extent noted, the cases cited by the defendant are apposite, and, of course, the subject matter of the conveyance must determine its character. If this case involved no more than the rights of the parties growing out of mortgages free from reservations and restrictions it would be one of easy solution upon this point, but the terms and provisions of the mortgages clearly evidence an intent to give an effect to the mortgages quite different from the usual and customary transaction which ordinarily obtains.
In this case the mortgages grant to the patentee a right equivalent in extent to ownership of the patent; true, it is a right subject to defeat upon failure to perform a condition subsequent, but in its essence a right to not only possess but use and receive the revenues derived from such use in the same manner as if the mortgages had not been made. Whatever else may be said, it seems clear that the right reserved by the mortgagor is a granted license extending generally and conferring upon it all the legal incidents of a licensee. We say this for the granted license was granted without-the payment of royalties and with a clear intent to permit the mortgagor to exercise the precise degree of ownership over the patent it had exercised prior to the execution of the mortgages, so that we have here a controversy, grant *308 ing arguendo ownership of the patent to the mortgagee, wherein the owner of a patent is charged with infringement of the same by the owner’s licensee. The owner of the patent can not himself sue, and the courts, we think, have uniformly established the rule that where this situation exists the licensee may sue the owner as an infringer in his own name.
In the case of Littlefield v. Perry, 21 Wall. 205, a leading and controlling case, the Supreme Court said (p. 223) :
“ A mere licensee can not sue strangers who infringe. In such case redress is obtained through or in the name of the patentee or his assignee. Here, however, the patentee is the infringer, and as he can not sue himself, the licensee is powerless, so far as the courts of the United States are concerned, unless he can sue in his own name. A court of equity looks to substance rather than form. When it has jurisdiction of parties it grants the appropriate relief without regard to whether they come as plaintiff or defendant. In this case the person who should have protected the plaintiff against all infringements has become himself the in-fringer. He held the legal title to his patent in trust for his licensees. He has been faithless to his trust, and courts of equity are always open for the redress of such a wrong. This wrong is an infringement. Its redress involves a suit, therefore, arising under the patent laws, and of that suit the Circuit Court has jurisdiction.”
In Waterman v. Mackenzie, 138 U. S. 252, 255, it was said:
“ In equity, as at law, when the transfer amounts to a license onty, the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice, as where the patentee is the infringer, and can not sue himself. Any rights of the licensee must be enforced through or in the name of the owner of the patent, and perhaps, if necessary to protect the rights of all parties, joining the licensee with him as a plaintiff.' Rev. Stat. § 4921. Littlefield v. Perry, 21 Wall. 205, 223; Paper Bag cases, 105 U. S. 766, 771; Birdsell v. Shaliol, 112 U. S. 485-487. And see Renard v. Levinstein, 2 Hem. & Mil. 628.”
In Robinson on Patents, Yol. Ill, page 424, the rule is stated that “ Licensees can not sustain an action in their own names alone, except when the licensor is the infringer,” *309 and the author cites to sustain the rule the cases cited in the Waterman v. Mackenzie case, supra.
We have no doubt that where the owner of a patent is charged with infringement by a licensee under a grant from the owner, the courts have steadfastly adhered to the equitable rule that the licensee may in his own name sue the owner for the alleged wrong. The mortgages involved granted rights to the mortgagor; these rights continued unimpaired until forfeiture of the same, the rights granted were not subject to invasion by the mortgagee so long as they subsisted, and the gravamen of plaintiffs’ petition is a direct charge of infringement against the mortgagee. Obviously, if plaintiffs are without a remedy, except by litigation in the name of the mortgagee, the latter eould infringe the patent rights with impunity. The cases cited we think are directed to this precise situation, and render the defendant’s contention in this respect without merit.
The act of June 25, 1910, the jurisdictional act in part involved in this case, reads as follows:
“Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the Court of Claims: Provided, however, That said Court of Claims shall not entertain a suit or reward compensation under the provisions of this act where the claim for compensation is based on the use by the United States of any article heretofore owned, leased, used by, or in the possession of the United States: Provided further, That in any such suit the United States may avail itself of any and all defenses, general or special, which might be pleaded by a defendant in an action for infringement, as set forth in title sixty of the Revised Statutes, or otherwise: And provided further, That the benefits of this act shall not inure to any patentee, who, when he makes such claim is in the employment or service of the Government of the United States; or the assignee of any such patentee; nor shall this act apply to any device, discovered or invented by such employee during the time of his employment or service.” (36 Stat. 851, 852.)
*310 It is to be noted that the remedy extended to inventors by the terms of the act not only authorizes suit in cases where the United States uses the invention “ without license of the owner,” but also in cases where the United States possesses no lawful right to use. The language of the act is “ or lawful right to use the same.’’'’ The defendant does not contend that a lawful right to use the invention to the injury of the plaintiffs obtained by reason of the execution of the mortgages. The argument upon this issue is alone addressed to the plaintiffs’ right to sue.
The patent in suit is, as stated by the patentee, one for “new and useful improvements in lubricating systems for traveling motors,” and the invention “ relates to motors and particularly to motors employed in aircraft.” The specifications recite in substance that aircraft motors have experienced difficulties in operation and lubrication due to the unusually severe conditions of service, and the invention described therein is intended to minimize these difficulties and accomplish lubrication of the motor, irrespective of whatever position it may assume in flight.
It was well known in advance of the patentee’s conception that because of the angles of flight assumed by airplanes, lubrication of the various parts of the internal-combustion engine used therein presented a problem for solution. Lubrication of the parts of the engine was manifestly indispensable, and so long as the attitude of flight remained in a horizontal position the problem was not unduly complex.
In airplane maneuvering, however, it is essential to bank the plane to accomplish turns to the right or left, to assume sharp angles from the horizontal in ascending and descending, and in some instances to turn the plane completely over, as well as engage in other angles of flight distinctly acute from a horizontal position.
The systems of lubrication revealed by the record, as used in motors, embraced what is designated as the “ splash ” and “ circulating ” systems. The splash system embodied a, crank case or sump fixed in place longitudinally of the engine, into which a sufficient quantity of oil was placed through and into which the lower gearings and parts of the engine passed with sufficiently rapidity to “splash” the oil to various *311 parts essential to lubricate. The crank case or sump, as it is sometimes called, served as a reservoir for the oil, and it was essential to maintain therein a sufficient quantity to effect successful operation. This system was quite _ generally employed in automobiles and other mechanisms using an internal-combustion engine.
The circulating system differed from the splash one in essential particulars. This system embodied a crank case in the same position as the splash one, but instead of resorting to the crank case as an oil reservoir an independent one was introduced and the oil fed from therein either by gravity or force to the various parts to be lubricated. A pump or combination of pumps actuated from the drive shaft of the engine maintained the oil, in combination with other elements, in circulation into and upon the various parts to be oiled.
Present in both systems was what is known as oil drippings, i. e., oil in excess of the quantity necessary to lubricate the parts of the engine dripped and found its way back into the crank case, accumulating therein in sufficient quantities to endanger the operation of the motor, in the way of “ stalling ” the same, and/or fouling the spark plugs of the engine. It was essential to care for this accumulation of drippings in the crank case, especially so when the motor assumed sharp and varying angles from the horizontal. It was well known to the prior art that if the motor were inclined upwards the oil would accumulate in the rear of the crank case and vice versa, the effect being that the excess quantity of oil in one end of the case would over lubricate the adjacent parts, possibly stall the engine, and foul the spark plugs, a condition fraught with hazards and danger, for it is obvious that an excess quantity of oil in one end of the crank case and substantially none in the opposite end materially interfered with the operativeness of the motor and constituted a fruitful source of trouble if not a complete impediment to normal functioning.
Curtiss, the original patentee, availing himself of the prevailing type of internal-combustion engines used in aircraft, directed his attention, as stated, toward “useful improvements in lubricating systems for traveling motors.” *312 The following illustrations taken from the patent in suit depict the various elements involved and disclose the pat-entee’s conception.

Fig. 1 is a diagrammatic illustration of the system, and Fig. 2 is a sectional view of the suction pumps. Lubricating oil enters the crank shaft from the oil reservoir 19 at a point a little below 15. “ This supply reservoir is preferably at a level from which the oil may feed by gravity to the various parts of the motor to be lubricated.” Cam shaft 14 and crank shaft 12 are hollowed out to form conduits through which the oil flows to the various similarly constructed to receive the same. Fig. 16 is the crank case or “ sump,” located longitudinally of the motor into which the surplus oil from the bearings drips. IT — 17 designates the location of two circulating pumps at either end of the motor, actuated by the cylindrical drive shaft 18 geared to the drive shaft of the engine. There is an additional circulating pump also actuated from drive shaft 18 and located alongside pump 17 on the right-hand side at 20. If oil, due to a variation of the motor in angle from the horizontal, accumulates at one end of the crank shaft or the other, one of the circulating pumps, 17 — 17, draws it out and delivers it into reservoir 19. If the riiotor maintains a normal horizontal position both *313 pumps function for a similar purpose. Pump 20, preferably of lesser pumping' capacity than pumps It- — 17, is utilized to force oil from reservoir 19 through the bearings of the motor to oil the same.
Forty claims appear in the patent, 23 of which are alleged to have been infringed by the defendant. Claims 5 and 38 are said by plaintiff to be typical. We quote them:
“ 5. A lubricating system for the motors of aircraft comprising a drainage reservoir arranged longitudinally of the motor, a pair of circulating pumps, one of said pumps drawing its supply from one end of said reservoir and the other from the other end thereof and a supply reservoir adapted to receive oil from said drainage reservoir, said supply reservoir being in communication with said drainage reservoir solely through said circulating pumps.”
“ 38. In a motor, the combination of an oil supply reservoir, a drainage receptacle arranged to receive the oil draining from the motor parts, said drainage receptacle permitting free and unobstructed flow therein of the used lubricant in the fore and aft direction and from one end to • the other, said drainage receptacle having a pair of scavenging outlets which are located adjacent its fore and aft ends and which lead through communicating passages to said supply reservoir, a pair of scavenging pumps associated respectively with said outlets and said passages and adapted to either collectively or individually withdraw the used lubricant from said receptacle and deliver the same to said reservoir at all ordinary angles of inclination of the motor, the drainage receptacle and supply reservoir being otherwise closed to each other in order to prevent back flow from the reservoir t,o the receptacle, and force lubrication means adapted to feed lubricant from said supply reservoir to the motor bearings.”
The essence of the Curtiss patent, as expressed in the brief of the plaintiffs, resides in the employment of two pumps, one located at one end and the other at, the opposite end of an uninterrupted crank case or sump, each pump functioning independently of the other and having their intakes so arranged to withdraw accumulated oil from whatever point in the crank case it accumulates due to the change in angle of the motor. The patent, it is said, precludes the flooding of the motor and maintains under all circumstances of use a substantially dry crank, case.
*314 PRIOR ART
In 1879 Joseph Rilatt applied a combination of pumps functioning independently of each other for the purpose of removing accumulated water from the hold of a vessel, pumps arranged, designed, and located so as to remove accumulated water from the hold of a vessel from either the windward or leeward side, which ever tack the vessel may be sailing.
The Rilatt patent, #213450, comprehended the maintenance of a substantially dry hold wherein water accumulated from the listing of the vessel from one side to the other. It undoubtedly discloses the availability of a combination of pumps for the purpose of removing excess fluids which accumulate by reason of the usual, ordinary, and customary use of the instrumentality to which they are attached. The patent does not, it is true, relate to lubricating systems, but it is designed to withdraw bilge water accumulating from the ship’s roll, and does disclose that resort to pumps to remove excess fluids from a given receptacle when their presence interferes is an old and well-known method, one quite naturally suggestive and appropriate.
Grieser and Yates, on February 5, 1907, were granted Letters Patent #843084. The inventors stated that “this invention relates to lubricating devices for machinery that is moved from place to place and which will assume different positions relative to the level or horizontal line.” It was particularly applicable to motor vehicles wherein the motors were subject to being inclined or declined as the vehicle climbed or descended grades, mountains, or hills.
The above patent discloses a lubricating system which functioned to take oil from an oil reservoir and spray it by syphonic action upon the parts of the motor to be lubricated. A single suction pump was connected to a single pipe which leads to the lower part of the crank case, where it was in turn connected to two branch pipes leading to opposite ends of a single crank case. So long as the motor vehicle did not attain an acute angle from the horizontal the patentee’s conception functioned to scavenge the excess accumulation of oil from the crank case, and, as observed by the plaintiff, “ within limited angles of service ” it was efficient.
*315 The difficulty with the construction disclosed arises from the location of the intake branches of the piping which feed the pump, and, as Finding XXVII specifically points out, the location of the pump with reference to the intake branches will occasion an uncovering of one of the same at the higher end of the crank case when the vehicle assumes an acute angle from the horizontal and thus break the suction of the pump and cause it t,o pump air rather than oil, thereby permitting under these circumstances an accumulation of oil at the lower end of the crank case, i. e., the intake will be elevated above the limits of the accumulated oil and obviously the pump can not function to remove it.
It is manifest from what has been said that the above patent will not accomplish what the patent in suit accomplishes. The Grieser and Yates construction, as specifically disclosed, is not adaptable to airplanes. The importance of the disclosure to one skilled in the art is not, as we view it, to be confined strictly to the operativeness of the patent when adapted to airplane motors. The inventors did conceive a lubricating system wherein under the circumstances stated a single suction pump functioned to maintain a substantially dry crank case, and thereby forestall the flooding of the motor and the fouling of the spark plugs. A pump was introduced into the system as a distinct functioning element to remove the source of interference caused by the accumulation of excess oil in the crank case, and it did under certain circumstances accomplish the purpose. A mistaken elevation or location of intake pipes which militates against the coni' flete effectiveness of the pump in scavenging the crank case at all angles of position which the motor may assume, it seems to us clearly suggests and points out to those skilled in the art that a rearrangement of the pipes will overcome the difficulty, or the introduction of an additional pump will perfect the system.
The Grieser and Yates patent embodies the essential elements disclosed in the patent in suit; its operativeness under the conditions specified therein is conceded. The problem to be solved was to the extent claimed solved, and from its specifications and claims we think the inference is irresisti *316 ble that a mere change of location of different parts, or the introduction of an additional element which in no way alters or brings into being a new and novel functioning device, does not involve invention. The patent teaches the essential elements of success; it specifies the functioning elements of the system; it arranges and locates the parts in such a way and manner that one coming later into the art has no more to do than take advantage of what has been done; and by rearrangements and relocations, as well as the use of additional pumps, renders the system more advantageous and adaptable to use under different conditions.
The patent granted to Winton June 15, 1909, discloses an internal-combustion motor having a lubricating system similar in principle to the one in suit. The crank case of the Winton patent is a single “ sump ” for receiving oil drippings ; inclined beneath and attached to it is a drainage pipe into which accumulated oil flows through a series of vertical risers. Below the bottom of the crank case a pair of pumps appears, actuated from the crank shaft of the engine, one pump being of larger capacity than the other, the larger one functioning to draw the oil from the crank case by having its intake connected to the sloping or oil-collecting pipe. The oil pumped by this pipe is delivered into an oil reservoir from which the second pump delivers it to the various parts of the engine to be oiled. The larger or “ scavenging ” pump will function to pump either oil or air or a mixture of the same.
The plaintiffs contest the accuracy of Finding XXIX as to the statement that the larger pump of the patent will function to pump air or a mixture of oil and air. If the finding in this respect is inaccurate, inasmuch as it is predicated upon capacity of the pump, then the same objection may be interposed as toi the functioning of the scavenging pumps of the patent in suit, for it is apparent that a change in attitude of the airplane will expose one intake of the pat-entee’s pumps to air alone. When the airplane is inclined to an acute angle oil' accumulates at the bottom end of the crank case, and the intake pipe for the front-end pump is exposed exclusively to air. Winton’s patent relates to, improvements in lubricating systems for automobiles in which *317 the oil is used over and over again for lubrication purposes. The patentee says, “ and to at the same time prevent any accumulation of the lubricating oil in the crank case.” The plaintiffs insist that Winton made no effort to solve the problem involved in the use of airplane motors, and that as a matter of fact he did not do it. This statement is deduced, we think, from the testimony of plaintiff’s expert, who expressly challenges the operativeness of Winton’s patent whenever the motor assumes a sharp angle from the horizontal i. e., angles as sharp and acute as airplane flying involves.
The Winton patent discloses a multiple of risers attached to the drainage tube as an outlet for accumulated oil in the crank case, and a pump of larger capacity than the distributing pump serves to scavenge the oil from the crank case as soon as it accumulates, and while it may be that some oil would accumulate inaccessible to the intake pipe at sharp angles, nevertheless the number of outlets for the oil from the case to the drainage pipe will minimize if not obviate this objection. Claim 7 of the Winton patent reads as follows:
“7. A lubricating system for automobiles comprising a crank-case, an oil-receiving reservoir, a distributing head, a feed-pump in communication with the crank-case and with the reservoir, a distributing pump in communication with the reservoir and with the distributing head, and. a plurality of distributing pipes in communication with said distributing head and with the crank-case, the feed pump adapted to take the oil from the crank-case faster than the distributing pump feeds it thereto through the head and distributing pipes.”
Winton was striving to maintain a dry sump or crank case and remove the troublesome features of an excess accumulation of oil therein. In so doing we are impressed with the-fact that he pointed out the essential elements to be employed, and employed them in such a way as to accomplish the purpose of his conception. Beyond a doubt Winton disclosed the possibility of a dry sump by the application of his applied elements, irrespective of the angle of the motor. Winton was in no sense ignorant of the problem he set out to solve or the difficulties inherent in its solution. On the contrary, to one skilled in the art Winton disclosed *318 the adaptability of his patent elements to the maintenance of a dry sump, and in addition conceived the possibility of additional pumps to function for a like purpose, a mechanism he sought to avoid, for in his specifications we find the following:
“ The present improvement also avoids the use of expensive forced-feed lubricators in which there is a separate pump for each distributing line, which mechanisms are delicate and liable to get out of order and fail to properly perform their function.”
The British patent to Austin is one of prime importance in the prior art. We reproduce a sectional longitudinal illustration of the same:

“A, A” designates two compartments into which the engine case is divided. Fixed to the underside of the compartments A, A is the receptacle or sump “ B ” into which the oil drippings from the motor flow. The bottom of each compartment is formed so as to drain toward the middle of the same, and this drainage channel “ a ” “ leads from the middle of each compartment into a slightly inclined tube £ c,’ which passes along through the interior of this receiver ‘ B ’ to near the further end thereof, and terminates above the level at which the oil stands when the receiver is in its normal or horizontal position.” The inclined drainage tubes “ c ” prevent by reason of their location and construction oil, which rises in either end of the oil reservoir or receiver, from flowing back into the crank case whenever the motor is inclined at an angle from horizontal.
*319 It is impossible, in view of the record, to ascribe inopera-tiveness to the Austin patent at angles acute from the horizontal, in so far as the employment of the gravity drainage tubes “ c ” is concerned. The oil reservoir or receiver is so constructed as to embrace both oil and air space, and to admit a back flow of oil from the reservoir to the crank case through the gravity tubes would require the oil to flow uphill from the end of the same where accumulated. At the most, however, regardless of the tubular operativeness, the patent discloses both a gravity and a pumping system, the former functioning within the range of its conceded operativeness, and the latter functioning irrespective of the tubes. Austin specifically points out that the gravity drainage tubes may or may not be used. The importance of their presence, as stated by the inventor, is the drainage of the crank case when the engine is standing still and no motive power available to actuate the pumps.
What is of real importance to the present issue is the patentee’s employment of pumps to scavenge the crank case at whatever angle the motor assumes. “ D ” indicates the location of three rotary pumps having a common axis. The middle pump pumps oil from the receiver “ B ” through the pipe “ d ” and delivers the same through the pipe “ d1 ” to the middle bearing “ E ” of the crank shaft and from there through branch pipes “ d 2 ” to the adacent bearings “ E1 ”, The two outside pumps of the set are together of greater pumping capacity than the middle one, and each one pumps oil through pipe “ e ” from the bottom of the crank case A and delivers the same through “ f ” into the receiver “ B.”
The Austin patent discloses a motor, a crank case provided with two separate drainage compartments, a single oil reservoir beneath the drainage compartments, inclined drainage tubes leading from the separate compartments of the crank case, and a pair of suction pumps, each one so connected by suction pipes to the bottom of the compartments of the crank case as to drain the same of excess oil and deliver the same into a receiver or reservoir from which a third or feed pump. of lesser capacity than the other two, pumps a sufficient supply therefrom to lubricate the various parts of the engine. The gravity tubes may or may not be utilized, and a single, *320 rather than a jiartitioned, crank case may be a single crank case is used, then the suction pipes should be located at the lowest or bottom part of the crank case.
The plaintiffs’ challenge to the Austin patent as anticipatory is addressed with emphasis to its detail of construction and operativeness under the conditions of airplane dying. It is asserted that Austin did not conceive the “ use of a single crank case containing the whole engine and multiple pumps for withdrawing the oil from different ends of that single compartment ”j that Austin’s patent exacts a drainage pump for each compartment, and if three compartments are used three drainage pumps must likewise be used.
We are unable to agree with the above contention. Austin expressly designates the use of the gravity drainage tubes as optional, and while he resorts preferably to a divided crank case he specifies in unmistakable terms that the partition of the same into two compartments may be dispensed with, and the operativeness of his invention when so dispensed with is set forth in detail. It is true the Austin pump intakes are not located at either end of the case, but we find no fact of record which disputes that they function to. remove oil from the end of the case where it accumulates because of changing conditions from the horizontal position of the engine.
In the Curtiss patent we find the following specification:
“ It will be readily understood by those skilled in the art after understanding my invention that as many pumps 17 associated with as many different portions of receptacle 16 may be provided as desired, and at different elevations, so that the motor may be adapted for travel at any inclination whatsoever, on end or even up side down.”
Obviously Curtiss contemplated the use of additional pumps when essential, and in the event his two scavenging pumps failed of their purpose or additional means were necessary to scavenge the crank case additional pumps might be employed for this purpose.
Austin was seeking to solve the identical problem with which the Curtiss patent was concerned, i. e., the fundamental difficulty incident to and a part of the employment of an internal-combustion engine in a service which exacted chang *321 ing attitudes from a normally horizontal one. True, Austin’s patent related, as he specified, to motor vehicles and motor boats, both of which in operation fall within the category of the problem to be solved. Austin brought into being a system of lubrication so related in its parts and employment of essential functioning elements that, as we view the case, all that remained to be done to adapt it to a changed condition in the art was to relocate and rearrange the identical elements he employed which might perhaps produce a more efficient but assuredly not a new and novel system of lubrication.
We think the Curtiss system embodies every element of the Austin patent, except the gravity tubes, each of which as rearranged and relocated functions precisely as the Austin patent does. Curtiss, we think, introduces no new element; he fails, we believe, to accomplish more than to unite elements old in the art, without alteration of their familiar functioning capacity, and brings into being a system modified as to detail but identical in achieving operative results.
The difference between invention and the exercise of mechanical skill is not always easily discernible. Invention concededly involves the creative faculty, an exercise of the mental processes to evolve some original thought or discovery. Mechanical skill, at least as to one manifestation, consists in part at least of taking from the art elements that are old, whose inherent qualities are well known and by a suggestive combination, itself familiar, rearrange and relocate them so as to produce a more useful form. Pumps and their functioning elements were very old. It was long known in the art that excess oil in a crank case occasioned by drippings from the lubricated parts of a motor was subject to removal by adaptation of pumps thereto. The use of pumps of a different capacity for this purpose was likewise old and the system of lubrication disclosed by the patent in suit was known. The art was a crowded one, and with the teachings of prior patents and the discussions and disclosures of what had been and could be done it seems to us that the patentee in this suit did not more than create by rearrangement and relocation of old elements a system which may *322 have functioned advantageously without in the least introducing into the art a new, novel, and original system of lubrication undiscovered prior thereto.
There is scarcely a patent cited in the prior art which did not resort to pumps to remove excess fluids accumulating because of variation in position of a motor engine. To locate pumps adjacent to accumulated fluids in order to remove them is not invention. It is a process which, because of its age, would suggest itself to one skilled in the art. If a single pump was inefficient for the designed purpose it is difficult to ascribe invention to the employment of two or more functioning for the same purpose; or, if a mistaken location of the pump or pumps fails to accomplish all that is required, nothing new, we think, is brought into the art by placing the pumps at a point where they will function to pump the receptacle dry. As was said by the Supreme Court in the case of Permutit Co. v. Graver Corporation, 284 U. S. 52, 60:
“Second. The further contention is that claim 5 can be sustained on the ground that, in providing for ‘ means connected to the lowest point or the casing for removing the salt solution,’ it introduced a novel element constituting invention. The only novelty suggested is that of placing the means at the lowest point of the casing. It does not require the exercise of the inventive faculty to place at the bottom of a receptacle the outlet through which it is to be drained, Smith v. Springdale Amusement Park, 283 U. S. 121, 123; Carbice Corp. v. American Patents Development Co., 283 U. S. 420, 421; Concrete Appliances Co. v. Gomery, 269 U. S. 177, 185.”
The court in the case of National Binding Mach. Co. v. Harper Paper Co., 242 Fed. 939, adjudicated an issue in many respects identical with the defense offered in this case. The patent involved in the case was a strip-serving apparatus, and infringement was alleged. The opinion of the district judge, as follows, was affirmed:
“ I am of the opinion that the foregoing claims of the patent in suit are void for lack of invention. The Piper patent, No. 700816, seems to have differed little from the patent in suit, except for the fact that the knife was placed in the Piper deviee before rather than in the rear of the moistening- pad, and in that device the paper was drawn by hand rather than served by a mechanism. In view of the state *323 of the art as disclosed in the Loree patent, No. 546981, the McDade patent, No. 549650, and the Tzschucke and Engel-mann patent, No. 68Y928, in each of which there was a strip-serving device and knife in the rear of the moistening pad, I do not think the cutting of the strip in the rear of the moistener is a sufficient improvement over the Piper device to show invention.”
What we believe to be an apposite precedent is found in the case of Voigtmann v. Weiss & Ridge Cornice Co., 148 Fed. 848, 851, 853. The patent before the court related to fireproof windows, and their construction exhibited elements old in the art and of familiar functioning capacity either individually or in combination. The court in disposing of the case adversely to the patentee’s contention of infringement, said:
“ If they, or any of them, constitute his invention or the mechanical equivalent of it, his patent is void for want of novelty. If the combination of elements disclosed in the claims had not been employed in the limited sphere of making and operating fireproof windows, claimed to be the special scope of the invention of the patent, they certainly had been employed in the same or closely allied art. * * *
“We have not overlooked the importance attached by plaintiff’s counsel to the location of the fusible link by Yoigt-mann ‘ at a point opposite the opening ’ of the window. No one can doubt that its location at or near that point more quickly subjected it to the current of rising hot air than it would have been if it had been located further away from the opening, especially so if the fire came from outside the building; but such location of the fusible link, where it reasonably should be placed to insure the performance of its intended function, is so obviously proper as not to impress it with the inventive quality. Anyone, arranging a device of the kind in question, at all familiar with the laws of physics, would instinctively place the link _ required to be speedily consumed where the fire would naturally reach it quickest.”
The use of airplanes propelled by internal-combustion engines presented, in our view of the case, in so far as existing systems of lubrication applicable to the use of internal-combustion engines from the beginning are concerned, no more than application of the old system altered to meet the new condition of use, speaking, of course, from the record in relation to the patent in suit. If a single pump was sufficient to *324 scavenge the crank case of a motor engine in normal attitude, and if the same construction functioned accordingly when the engine attained slight angles from the horizontal, surely it is not invention to add an additional pump or pumps to accomplish what, to everyone is apparent, a single pump will not do . The Supreme Court in Mast, Foos & Co.v. Stover Mfg. Co., 177 U. S. 485, 493, said: “To apply it [the combination] to a new purpose in a machine where it had not before been used for that purpose ” is not invention. As was said by the Circuit Court of Appeals in the case of Prepayment Car Sales Co. v. Orange County Traction Co., 214 Fed. 402, 409, a case involving an alleged patent related to collection of fares on “ pay as you enter ” street cars, “ I am of opinion that there is no patentable invention in the location of the door-controlling means upon the platform in accordance with the convenience of the person who is to operate it. Wherever located, its function is the same, and a change in its location involves ordinary mechanical skill, not invention.” In the case of DeForest Radio Co. v. General Electric Co., 283 U. S. 664, 682, we find the following language:
“ The question is not, as respondent argues, whether Lilienfeld or others made a practical high-vacuum tube, but whether they showed how it could be made, and demonstrated and disclosed the relationship of the discharge to reduced pressure, and how to reduce it. See Corona Co. v. Dovan Corp., 276 U. S. 358, 384.”
See also In re Gernandt, 40 Fed. (2d) 771.
We will not discuss in detail the German publication Deutsche Zeitschrift für Luftschilfahrt, published February 8,1911, which by reference thereto discloses a 180-horsepower Korting airship motor embodying the essential elements of a circulatory system of lubrication and a pump functioning to maintain a dry crank case while in flight. It is enough to note that this publication, in connection with the numerous prior-art patents cited in the findings, fully sustains, in our opinion, the court’s Finding XXXII.
The progress of the Curtiss patent through the Patent Office, exhibited by the file wrapper and contents, indicates that certain claims must of necessity be limited to a specified location of the pumps functioning to keep the lubricating oil *325 in circulation. Curtiss mounted bis pumps at tbe points indicated, and his specifications set forth the importance of so doing. In April, 1916, the exaihiner in a letter said: _
“ It may involve invention to specifically locate two pumps on the motor of a flying machine because of the peculiar problem there demanding solution. But it certainly is not invention to utilize two pumps on any motor to perform the work of one, and unless their location be sufficiently stated to indicate their peculiar function, such claims can not be allowed. To say that the pumps take their supply from different parts of the reservoir is not to define anything useful.”
Thereafter the specifications were amended by Curtiss by stating:
“ Particular attention is directed to the specific location of the pump 17. An aeronautical motor, in use, often assumes a substantially vertical position and as a consequence the oil contents of the drainage reservoir must gravitate to the lower end of the motor. By utilizing the dual pump system and arranging the pumps as specified at the opposite terminals of the drainage reservoir, the lubricant under all circumstances is fed to the supply reservoir 19.”
So that in any event the extent and scope of the patent is by certain claims limited, and as thus limited the Government’s motors do not infringe the claims which specifically call for the location of the pumps. The Curtiss patent doubtlessly served to maintain a substantially dry crank case in an airplane motor when the same went into acute angular positions. It did this by the location of a plurality of pumps rather than single ones. This precise thing had been done repeatedly in relation to automobile motors, and its application to airplanes was publicly discussed and disclosed in advance of the Curtiss patent. Not one but all engaged in the art had resorted to pumps to free the crank case from excess oil, and after a careful analysis of the record the case impresses us that the teachings of the prior art definitely establish that it was only within the limits of skilled mechanics to adapt existing and old functioning elements to a new condition of use which in its essential elements exacted no more than the application of the old system in a modified form without altering in any essential particular its func *326 tioning elements, or introducing into it a new and novel method of operation.
The petition will have to'be dismissed. It is so ordered.
Williams, Judge/ LittletoN, Judge; and Green, Judge, concur.
Whalet, Judge, heard this case as commissioner of the court, and took no part in its decision.